IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

DONNA CISSON, et al.,

           Plaintiffs,

v.                                  CIVIL ACTION NO.  2:11-cv-00195

C. R. BARD, INC.,

           Defendant.

**MEMORANDUM OPINION AND ORDER**
(*Plaintiffs' Ancillary Motion and Bard's Motion to Remit*)

Pending before the court are Plaintiffs' Ancillary Motion for the Court to Declare That O.C.G.A. § 51-12-5.1(e)(2) Is Unconstitutional ("Ancillary Motion") [Docket 454] and Defendant C. R. Bard, Inc.'s Motion to Remit Punitive Damages Award and Amend Judgment ("Motion to Remit") [Docket 452]. For the reasons below, both motions are **DENIED**.

I. **Background**

This case was the first jury trial within the seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). In the seven MDLs, there are more than 70,000 cases currently pending, approximately 10,000 of which are in the C. R. Bard, Inc. ("Bard") MDL, MDL 2187. This particular case concerns Donna Cisson, who was implanted with transvaginal surgical mesh—specifically, the Avaulta Plus Posterior Biosynthetic Support System ("Avaulta Plus") manufactured by Bard to treat POP—in May 2009, and after receiving the implant, she experienced "significant mental and physical pain and suffering."

(Compl. [Docket 1] ¶ 10). On March 10, 2011, she and her husband (collectively "the plaintiffs") filed suit against Bard for various causes of action, (*id.*), and trial began on July 29, 2013.[1] After fourteen days of trial, the plaintiffs ultimately presented three distinct claims to the jury: design defect, failure to warn, and loss of consortium.

On August 15, 2013, the jury returned a verdict in favor of Ms. Cisson on her design defect and failure to warn claims.[2] In so doing, the jury awarded Ms. Cisson $250,000 in compensatory damages, (Verdict Form [Docket 404] ¶ 4), as well as $1,750,000 in punitive damages, (Verdict Form [Docket 406]). After the trial, I considered and denied Bard's renewed motion for judgment as a matter of law, finding that the plaintiffs' claims had sufficient evidentiary basis such that the jury's verdict was reasonable under Federal Rule of Civil Procedure 50. (Mem. Op. & Order [Docket 448]). Accordingly, I entered judgment in favor of the plaintiffs. (J. Order [Docket 449]).

Bard now moves to remit the punitive damages award from $1,750,000 to $250,000. (Def.'s Mem. in Supp. of Mot. to Remit Punitive Damages Award and Amend J. ("Mem. in Supp. of Remit") [Docket 453], at 1). In addition, the plaintiffs have asked the court to declare Georgia's punitive damages statute, Ga. Code Ann. § 51-12-5.1(e)(2), unconstitutional (Ancillary Mot. [Docket 454]). Georgia's Attorney General, whom I allowed to intervene in this case for the limited purpose of weighing in on this statute, (Order [Docket 475]), has also filed a memorandum in favor of its constitutionality, (s*ee generally* Att'y General's Mem. of Law in Opp. to Pls.' Mot. [Docket 476]). My ruling on these matters is set forth below, beginning with a constitutional evaluation of § 51-12-5.1(e)(2) and then turning to the question of remittitur.

---

[1] This case was first tried on July 8, 2013, but resulted in a mistrial. (*See* Trial Tr. July 10, 2013 [Docket 339], at 495:20). The court then moved the trial to July 29, 2013, which produced a verdict.
[2] The jury found that Mr. Cisson had not proven his loss of consortium claim by a preponderance of the evidence.

## II. The Constitutionality of Ga. Code Ann. § 51-12-5.1(e)(2)

Like many states, Georgia has codified its position on the acceptable use of punitive damages in tort actions arising under Georgia law. *See generally* Ga. Code. Ann. § 51-12-5.1 (2014). As part of its Tort Reform Act of 1987, Georgia added new provisions to its punitive damages scheme that apply specifically to the recovery of punitive damages in products liability cases. In relevant part, § 51-12-5.1(e)(2) provides that

> [s]eventy-five percent of any amounts awarded under this subsection as punitive damages, less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge, shall be paid into the treasury of the state through the Office of the State Treasurer.

*Id.* § 51-12-5.1(e)(2). The plaintiffs argue that because § 51-12-5.1(e)(2) requires a prevailing plaintiff in a products liability lawsuit to pay 75% of her punitive damages award to the state, the statute violates the Equal Protection Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment. (Pls.' Mem. in Supp. of Ancillary Mot. [Docket 455], 2–4). Applying the standards set forth below, I **FIND** no constitutional shortcomings.

### A. Legal Standard

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. The Supreme Court has explained that this clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In reviewing an Equal Protection challenge, the court must first ask whether the plaintiff "has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful government decision." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 (4th Cir. 2013) (internal quotations and brackets omitted). Then, the court must examine the disparity "under the requisite level of

scrutiny." *Id.* Both sides agree—as does this court—that rational basis scrutiny applies to the plaintiffs' equal protection challenge to § 51-12-5.1(e)(2). *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (holding that "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage," a court should apply rational basis review). That is, to satisfy the Equal Protection Clause, the statute must be "rationally related to a legitimate state interest." *Id.*

The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239 (1897), provides that the government shall not take "private property . . . for public use without just compensation." U.S. Const. amend. V. In reviewing a challenge to a statute under the Takings Clause, a court must first "determine whether a constitutionally protected property interest exists." *Washlefske v. Winston*, 234 F.3d 179, 184 (4th Cir. 2000). To ascertain whether the plaintiff has such an interest in the property at issue, the court must look to state law. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source, such as state law. . . ."). If no cognizable property interest exists, then there is no violation of the Takings Clause. *See W. Va. CWP Fund v. Stacy*, 671 F.3d 378, 386 (4th Cir. 2011) (finding that the Takings Clause did not apply because the statute at issue did not infringe upon "a specific, identifiable property interest").

### B. Discussion

Four cases have spoken on the constitutionality of § 51-12-5.1(e)(2). *See McBride v. Gen. Motors Corp.*, 737 F. Supp. 1563 (M.D. Ga. 1990); *Mack Trucks, Inc. v. Conkle*, 436 S.E.2d 635

(Ga. 1993); *State v. Moseley*, 436 S.E.2d 632 (Ga. 1993); *Ford v. Uniroyal Goodrich Tire Co.*, 476 S.E.2d 565 (Ga. 1996). Out of the four, only the earliest, *McBride*, struck down the statute as unconstitutional. 737 F. Supp. at 1579. The three subsequent cases heard by the Supreme Court of Georgia upheld the constitutionality of § 51-12-5.1(e)(2). Taking these cases together—as well as similar cases from around the country—and applying the constitutional standards set forth above, I **FIND** that § 51-12-5.1(e)(2) does not violate the Constitution.

*1. There Is No Violation of the Equal Protection Clause*

As an initial matter, § 51-12-5.1(e)(2) admittedly distinguishes between products liability plaintiffs and other tort plaintiffs, allowing the latter to retain 100% of any punitive damages award, while limiting the former to 25% of the punitive damages award and directing the remaining 75% to the state. The question, therefore, becomes whether this classification is rationally related to a legitimate state interest. In *Mack Trucks, Inc.*, the Supreme Court of Georgia identified the legitimate state interest advanced by § 51-12-5.1(e)(2):

> [W]e think that the purpose of this subsection is to authorize punishment of a defendant who has the potential to *greatly damage a society at large*. The statute furthers this purpose by not allowing the first plaintiff to reach the courthouse with a product liability lawsuit to reap a windfall from the punitive damages, but instead requiring that three-quarters of the punitive damages award be paid into the state treasury *for the benefit of all Georgia citizens*. Punishment and deterrence of the defendant being the purpose of the subsection, it is insignificant under the statute that the plaintiff does not receive the full award. . . .
>
> In a case in which the cause of action arises from product liability, the risk falls on society as well as on the individual plaintiff who has been harmed. . . . *As the risk and harm are distributed between the individual plaintiff and all citizens of Georgia, the legislature has seen fit to distribute a portion of the damages awarded to those at potential risk—all citizens of the state*.

*Mack Trucks, Inc.*, 436 S.E.2d at 638–39 (emphasis added). Put simply, the Supreme Court of Georgia held that § 51-12-5.1(e)(2) furthers the legitimate state interest of deterring conduct that has the potential of harming all citizens, not just the plaintiff, and of compensating the citizenry,

5

as well as the plaintiff, for having to bear that potential risk. *Id.* The court reaffirmed this holding in two subsequent cases. *See Moseley*, 436 S.E.2d at 634 (concluding that § 51-12-5.1(e)(2) does not violate equal protection); *Ford*, 476 S.E.2d at 570 (same).

I must interpret the purpose of § 51-12-5.1(e)(2) as stated by the highest court of Georgia. *See CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 118 (4th Cir. 2004) ("[The court] must interpret [Maryland] law as it appears that the Maryland Court of Appeals would . . . ."). Accordingly, I do not find the equal protection analysis set forth by the federal court in *McBride* as persuasive, especially considering that *McBride* was decided as an issue of first impression. *Compare McBride*, 737 F. Supp. at 1568 (identifying the state interests advanced by § 51-12-5.1(e)(2) as generating revenue, punishing a manufacturer, and facilitating business operations), *with Mack Trucks, Inc.*, 436 S.E.2d at 639 (rejecting "revenue raising" as the purpose of the statute and instead finding the purpose to be distributing the risk of harm created by products liability among all citizens of the state). The interest set forth in *Mack Trucks, Inc.* provides a rational basis for allocating the punitive damages award between the citizenry and the plaintiff, and therefore, I uphold § 51-12-5.1(e)(2) against the plaintiffs' equal protection challenge. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."); *Wilkins v. Gaddy*, 734 F.3d 344, 347 (4th Cir. 2013) ("[C]ourts generally accord the legislation a 'strong presumption of validity' by applying a rational basis standard of review." (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993))). Thus, I **DENY** the plaintiffs' Ancillary Motion [Docket 454] on this point.

### 2. *There Is No Violation of the Takings Clause*

As explained above, a claim under the Takings Clause requires the existence of a "constitutionally protected property interest." *Washlefske*, 234 F.3d at 184. Georgia has expressly held that "[a] plaintiff has no vested property right in the amount of punitive damages which can be awarded in any case." *Mack Trucks*, 436 S.E.2d at 639. As a result, the 75% of punitive damages paid to the state under § 51-12-5.1 does not constitute a taking. *Id.*

The only federal court to confront the issue of whether punitive awards qualify as property for purposes of the Takings Clause has agreed with this conclusion, largely relying on the contingent and discretionary nature of punitive damages awards.

> [P]unitive damages are "never awarded as of right, no matter how egregious the defendant's conduct," in contrast to compensatory damages, which "are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss." *Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 75 L. Ed. 2d 632 (1983). Because of the inherently uncertain nature of punitive damages, which are a "discretionary moral judgment" by the jury, *Larez v. City of Los Angeles*, 946 F.2d 630, 648 (9th Cir. 1991) (internal quotation marks omitted), a plaintiff's interest in receipt of any certain amount of punitive damages is too speculative to constitute property under the Takings Clause. . . .
>
> Our conclusion that a plaintiff's interest in receipt of a certain amount of punitive damages is not "property" under the Takings Clause is further supported by consideration of the purposes of punitive damages awards. Punitive damages may be imposed to serve two policy interests: "punishing unlawful conduct and deterring its repetition." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). A punitive damages award does not serve any compensatory goals. In the words of the Iowa Supreme Court, "a plaintiff is a fortuitous beneficiary of a punitive damage award simply because there is no one else to receive it." *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 619 (Iowa 1991). As a "fortuitous beneficiary," a tort claimant does not possess an interest cognizable as a property right under the Takings Clause. The Supreme Court has also emphasized that "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U.S. at 568, 116 S. Ct. 1589. Given the broad discretion granted to the States in fashioning their punitive damages schemes, we uphold the constitutionality of the Oregon statute against Engquist's Takings Clause challenge.

*Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1003–04 (9th Cir. 2007), *aff'd sub nom.*, 553 U.S. 591 (2008) (considering Oregon's split-recovery statute, which provides that sixty percent of any punitive damages award must go to the state's Criminal Injuries Compensation Account).[3]

I agree with the Ninth Circuit's analysis. The plaintiffs have no property interest in the award of punitive damages in this case, and as a result, I **FIND** that Georgia's confiscation of 75% of the award does not violate the Takings Clause. I therefore **DENY** the plaintiffs' Ancillary Motion [Docket 454] on these grounds. Having confirmed the constitutionality of the Georgia punitive damages statute at issue, I now assess Bard's argument that the awarded amount violates the Due Process Clause such that the court should order a remittitur.

### III. Remittitur of Punitive Damages

The jury awarded $1,750,000 in punitive damages. (Verdict Form [Docket 406]). This amount is seven times more than the compensatory damages award of $250,000. Bard asks this court to remit the punitive damages amount to $250,000, a one-to-one ratio of punitive damages to compensatory damages, on the theory that the seven-to-one ratio is constitutionally excessive under the facts of this case. (*See* Mem. in Supp. of Remit [Docket 453], at 1).

#### A. Legal Standard

The common law mechanism of remittitur is not codified in the Federal Rules of Civil Procedure and is best understood as a variant of Rule 59(a) motion for a new trial. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998) (explaining that remittitur "is used in connection with Fed. R. Civ. P. 59(a)").[4] Under the practice of remittitur, if the trial court finds

---

[3] Aside from Georgia, four other state supreme courts have come to the same conclusion reached by the Ninth Circuit. *See Cheatham v. Pohle*, 789 N.E. 2d 467, 474–75 (Ind. 2003); *Evans v. State*, 56 P.3d 1046, 1058 (Alaska 2002); *Gordon v. State*, 608 So. 2d 800, 801–02 (Fla. 1992) (per curiam); *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 619 (Iowa 1991).

[4] Bard's characterization of its Motion to Remit as a request pursuant to Federal Rule of Civil Procedure 59(e), therefore, is incorrect. *See G.M. Garrett Realty, Inc. v. Century 21 Real Estate Corp.*, 17 F. App'x 169, 173 (4th Cir. 2001) (explaining that the defendant's "characterization of its Motion for Remittitur as a motion to alter or amend

the damage award excessive, it "orders a new trial unless the plaintiff accepts a reduction [in the] jury award." *Id.* Allowing the plaintiff the choice between a new trial and a reduced award safeguards the plaintiff's Seventh Amendment right to a trial by jury. *See Hetzel v. Prince William Cnty., Va.*, 523 U.S. 208, 211 (1998) ("[I]n accord with the Seventh Amendment's prohibition on the reexamination of facts determined by the jury, a court has no authority . . . to enter an absolute judgment for any other sum than that assessed by the jury.") (internal quotations omitted).

Here, Bard challenges the jury's punitive damages award of $1,750,000 on constitutional grounds, asserting that the award violates the Due Process Clause of the Fourteenth Amendment.[5] Applied to the present context, the Due Process Clause "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). To determine whether a punitive damages award is grossly excessive such that it falls short of due process, a court must consider three "guideposts" identified by the Supreme Court:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* at 418 (citing to *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). If analysis under these guideposts suggests that the award of punitive damages is reasonable and in furtherance of the "legitimate interests in punishing unlawful conduct and deterring its repetition," *Gore*, 517 U.S. at 568, then there is usually no basis for ordering a remittitur. *See, e.g.*, *Saunders v. Branch*

---

the judgment under Rule 59(e) is inappropriate"). I overlook this mischaracterization, however, because Bard filed an appropriate Motion for a New Trial pursuant to Rule 59(a) [Docket 450] and for Judgment as a Matter of Law pursuant to Rule 50(b) [Docket 439]. *See id.* at 173 ("Because [the defendant] moved under Rule 50(a) for a directed verdict at the close of evidence, the court may still review the sufficiency of the evidence supporting the award.").

[5] U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law; . . .").

*Banking & Trust Co. of Va.*, 526 F.3d 142, 155 (4th Cir. 2008) (denying remittitur of the punitive damages award because the *Gore* guideposts indicated that jury "was not unduly moved by sympathy or bias").[6] As a backdrop to this process, a court should keep in mind that a judgment produced by fair procedures, an impartial jury, and "collective deliberation" based on evidence and argument is "entitled to a strong presumption of validity." *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 456–57 (1993).

### B. Discussion

I now discuss each guidepost—reprehensibility, ratio of punitive damages to compensatory damages, and comparable penalties—in light of the facts presented to the jury in this case, ultimately concluding that the punitive damages verdict against Bard passes constitutional muster.

#### 1. Reprehensibility

The first guidepost, often considered the most important, directs the court to evaluate "the reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575; *see also id.* at 575 n.23 ("The flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages."). In its consideration of the defendant's reprehensibility, a court should consider whether:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health and safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct

---

[6] Some federal courts have considered a constitutional challenge to a punitive damages award as "procedurally different [from] a traditional remittitur." *Snyder v. Phelps*, 533 F. Supp. 2d 567, 575 (D. Md. 2008). A constitutional reduction of damages "is a determination that the law does not permit the reward," whereas a remittitur is the determination that the jury's award is "unreasonable on the facts." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999). In the latter case, the Seventh Amendment right to a jury mandates the plaintiff be given the option of a new trial. In the former case, however, when an award is "unconstitutionally excessive," the court has a "mandatory duty to correct [it]," *id.*, and the option for a new trial "is unwarranted." *Snyder*, 533 F. Supp. 2d at 575. I need not determine whether the option for a new trial exists here because, as described below, I uphold the award of punitive damages in this case as constitutional.

involved repeated actions or was an isolated incident; and [5] the harm was a result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419. Review of the evidence presented to the jury in this case confirms all but one of these factors.

First, the plaintiffs experienced permanent physical harm, as opposed to economic harm. Indeed, the trial record is replete with descriptions of the pain and physical injury that Ms. Cisson suffered after undergoing implant surgery. (*See, e.g.*, Trial Tr. Aug. 5, 2013 [Docket 373], at 84:1–89:1) (introducing testimony from Ms. Cisson, in which she describes the severe pain she experienced after her mesh implant surgery); Pls.' Ex. 1227A [Docket 418-1], at 15–16 (providing testimony of Ms. Cisson's physician, who opined that Ms. Cisson's vaginal pain following her implantation resulted from extrusion of the mesh)). Moreover, the evidence indicated that this pain is "permanent in nature." (Trial Tr. July 31, 2013 [Docket 367], at 42:24–43:6 (testimony from Dr. Lennox Hoyte)). The permanent physical harm resulting from Bard's conduct has critical weight in the court's evaluation of Bard's reprehensibility. *See e.g.*, *Clark v. Chrysler Corp.*, 436 F.3d 594, 601 (6th Cir. 2006) (expressing that the physical harm resulting from the defendant's conduct "weighs heavily in favor of finding [the defendant's] conduct reprehensible").[7]

Second, the evidence presented at trial demonstrates indifference and reckless disregard of the health and safety of Ms. Cisson. The plaintiffs introduced evidence of both Bard's knowledge of its product's risks and Bard's conscious decision to do nothing in the face of those risks. As I explained in my ruling on Bard's Renewed Motion for Judgment as a Matter of Law,

---

[7] Bard tries to minimize the weight of this factor by expressing Ms. Cisson's physical injuries as "non-life threatening." (Def.'s Reply [Docket 468], at 5). The evidence makes clear that Ms. Cisson's injuries, while not life-threatening, are indeed life-altering, and as such, I can easily discount Bard's "it could be worse" argument. *See Cooley v. Lincoln Elec. Co.*, 776 F. Supp. 2d 511, 550 (N.D. Ohio 2011) ("[T]he idea that 'it could be worse' is not persuasive in the context of permanent neurological injury.").

11

"a reasonable jury could find by clear and convincing evidence that Bard's conduct exhibited an entire want of care raising the presumption of conscious indifference to the consequences." (Mem. Op. & Order [Docket 448], at 24). I then outlined the persuasive evidence, beginning with Bard's knowledge of the polypropylene Material Safety Data Sheet ("MSDS"):

> Bard was aware of the Phillips MSDS warning not to use "this Chevron Phillips Chemical Company LP material [polypropylene resin] in medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues." (Pls.' Ex. 482). Bard was thus on notice that products made from polypropylene resin should not be permanently implanted in the human body. However, Bard failed to ask Phillips about the MSDS warning. (*See* [Trial. Tr. Aug. 7, 2013, at 61:8–18]). In fact, Bard intentionally avoided alerting Phillips that it was surreptitiously purchasing Phillips's polypropylene resin via third parties. (*See id.* at 68:13–70:4; Pls.' Ex. 613).

(*Id.*). In addition, I recalled evidence demonstrating that Bard "understood the dangers of using polypropylene for tissue repair, including a higher risk of erosion and infection; a greater amount of scar tissue formation around the mesh; and a tendency 'to unravel, creating a sharp 'fishing line' effect, which can slice through the patient's tissue.'" (*Id.* at 25 (quoting Pls.' Ex. 375)). Yet, Bard did nothing with this knowledge and even overruled suggestions to conduct premarket human trials. (*Id.* (citing to Pls.' Ex. 1213A)). This analysis, though applied in the context of a motion for judgment as a matter of law, demonstrates Bard's indifference to and conscious disregard of patient health and safety. In addition, the plaintiffs have pointed to several other signs of Bard's conscious indifference that was presented to the jury, such as Bard's knowledge that the arms on the Avaulta Plus could "saw" through tissue. (*See* Pls.' Resp. in Opp. to Bard's Mot. to Remit ("Resp. to Mot. to Remit") [Docket 460], at 5–7 (citing to Pls.' Ex. 1242A [Docket 419-14])).[8]

---

[8] Bard argues that the court should not consider evidence unrelated to the MSDS to decide on remittitur because the court "only" considered MSDS-related conduct in its decision to submit the punitive damages claim to the jury. (Def.'s Reply [Docket 468], at 3). This argument is off base. Though largely persuaded by Bard's conscious failure to heed the MSDS, this court found "a combination of evidence" as sufficient to allow the jury to consider the

In response, Bard contends that its implementation of planning activities, "decades of testing," physician training courses, and post-market surveillance, among other things, mitigated the substantial punitive damages award in this case. (Mem. in Supp. of Remit [Docket 453], at 3). Given the overriding evidence, I disagree. These efforts did nothing to address the specific defects alleged by the plaintiffs, such as the problems caused by polypropylene's reaction with human tissue and the sawing effect created by the arms on the device. Even assuming Bard's testing and surveillance mitigated its responsibility to a slight degree, it is not enough to convince this court that the jury's punitive damages award was "grossly excessive" such that it should be abandoned.

The third factor has no import here. While the financial vulnerability of the plaintiff matters when she has experienced economic harm, *see Gore*, 517 U.S. at 576 ("To be sure, infliction of economic injury, especially . . . when the target is financially vulnerable, can warrant a substantial penalty."), it has little to no relevance when the plaintiff's injuries are entirely physical. *See Clark*, 436 F.3d at 604 (concluding that because economic injury is not involved, "wealth is not an appropriate basis" for the punitive damages award). Thus, I do not consider it in assessing the reasonableness of the punitive damages award.

Like the first and second factors, the fourth—whether the conduct involved repeated actions or an isolated incident—also leans against Bard. I find two Fourth Circuit cases

---

punitive damages claim, including Bard's understanding and disregard of the dangers involved with using polypropylene for tissue repair, as well as Bard's decision not to conduct human testing. (Mem. Op. & Order [Docket 448], 25–26). In any event, what the court found persuasive in denying Bard's motion *as a matter of law* did not limit what the jury could consider in awarding punitive damages *as a matter of fact*. Contrary to Bard's argument, *Campbell* does not alter this conclusion. *Campbell* merely requires the conduct upon which liability was premised to be the same conduct upon which punitive damages were awarded. *Campbell*, 538 U.S. at 423–24. And here, the compensatory damages and punitive damages against Bard both arose from its misconduct that resulted in Ms. Cisson's injuries. Accordingly, I do not see any error in considering Bard's MSDS-related conduct, as well as its non-MSDS-related conduct, in my evaluation of the reprehensibility of Bard's conduct. *See, e.g.*, *Nance v. Ky. Nat'l Ins. Co.*, 240 F. App'x 539, 547 (4th Cir. 2007) (considering facts aside from those considered by the district court in its ruling on a motion for judgment as a matter of law).

instructive on this matter. In *Saunders v. Branch Banking & Trust Co. of Virginia*, the court considered an award of punitive damages for violations of the Fair Credit Reporting Act. 526 F.3d 142, 145 (4th Cir. 2008). Although the defendant did not engage in "repeated" violations of the Act, the court nevertheless weighed this factor against the defendant because the evidence demonstrated a "longstanding refusal to correct its errors," which, in the court's view, is "more reprehensible [than] a mistake quickly corrected." *Id.* at 153. The court ultimately upheld the punitive damages amount. *Id.* at 155. Similarly, in *E.E.O.C. v. Federal Express Corp.*, the Fourth Circuit found that the defendant's "continuing failure and refusal to provide [Americans with Disabilities Act] accommodations" demonstrated repetitive, reprehensible conduct under the fourth factor. 513 F.3d 360, 377 (4th Cir. 2008).

  The evidence in the case at bar demonstrates that, like the defendants in the Fourth Circuit cases, Bard had a longstanding and continuous habit of refusing to modify its tortious conduct. In 2007, after becoming aware of the MSDS warning against using polypropylene resin as a permanent medical implant, Bard did not perform new tests on its product or contact the resin manufacturer about the warning, and instead continued to use the resin in its mesh products. (*See* Trial Tr. Aug. 7, 2013 [Docket 377], at 60:24–62:14 (presenting testimony from Mr. Roger Darois, Vice President of Research and Advanced Technologies for the Davol division of Bard, who confirmed Bard's inaction after discovering the MSDS)). Furthermore, though several physicians and researchers suggested further testing on the Avaulta Plus prior to market, Bard repeatedly declined to perform such tests. (*See* Pls.' Ex. 1216A [Docket 417-1], at 47:20–48:08 (providing testimony of Dr. Jim Ross, who testified that Bard never carried out his recommendation to conduct randomized controlled trials on women prior to marketing the Avaulta Plus); *id.* at 119:12–22 (testifying that Bard never did a clinical trial on the Avaulta Plus

prior to launch, although Dr. Ross had suggested it)). And finally, with respect to the tests it did perform, Bard disregarded the adverse results, (*see, e.g.*, Pls.' Ex. 1241A [Docket 419-12], at 128:25–131:25 (providing testimony of Mr. Mark Downey, the President of Bard's Davol division, in which he stated that he "didn't do anything" about evaluations from 2008 indicating "the importance of reducing complications," nor did he "inquire" about what should be done about the complication rates)), and declined to inform physicians about the results, (*see, e.g.*, Trial Tr. July 30, 2013 [Docket 365], 105:9–20 (presenting the testimony of Dr. Raybon, Ms. Cisson's physician, who stated that he did not know that Bard's testing demonstrated that the Avaulta Plus did not have "optimal pore size," which could result in the mesh shrinking by 30–50%)). Put simply, the evidence demonstrated that during the market life of the Avaulta Plus, Bard knew about the risks posed by the product and its complication rates, but time and again, Bard did not act to correct the problems. This longstanding and continuous behavior strongly indicates reprehensibility.

Finally, turning to the last factor, the evidence presented to the jury showed that the plaintiffs' harm resulted in part from Bard's deceit. Predicting that resin manufacturers would no longer supply resin to Bard if they discovered the MSDS and Bard's contravention of it, Bard decided to actively conceal its use of the material in pelvic mesh implants. (*See* Trial Tr. Aug. 7, 2013 [Docket 377], at 64:6–8 ("Q: And you're saying [in this email], 'We don't want Phillips to know that we are using this for a medical device.' Correct? A: That's correct."); *id.* at 70:13–16 (introducing an email that said, "Once again, we need to be certain that we don't contact the resin supplier directly due to the sensitivity of our implant application."); *id.* at 66:22–67:4 (introducing testimony that one of Bard's suppliers, Shakespeare, refused to supply resin to Bard after obtaining a copy of the MSDS); *id.* at 69:3–8 (emphasizing the need to keep the medical

use of the resin "proprietary" to ensure that suppliers would not "cut off" Bard's supply)). Bard even went as far as to surreptitiously purchase the resin from third parties. (*Id.* at 69:3–8). This secretive conduct in an effort to sidestep the MSDS warnings suggests reprehensible conduct, weighing against remittitur.

To summarize, four out of the five aggravating factors corroborate the reprehensibility of Bard's conduct, as determined by the jury. With the first and most important guidepost indicating constitutional validity of the punitive damages award, I move to the second guidepost.

### 2. Ratio

The second guidepost requires the court to compare the amount awarded in compensatory damages to the amount awarded in punitive damages. The Supreme Court has consistently "decline[d] to impose a bright-line ratio which a punitive damages award cannot exceed." *Campbell*, 538 U.S. at 425. The Court has cautioned, however, that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* "Reasonable[ness] and proportiona[lity]" are key. *Id.* Here, the punitive damages award was seven times greater than the compensatory damages award. Given this single-digit multiplier, the court, from the start, can predict that the award most likely comports with due process. *See id.* ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 [or] 145 to 1."); *Saunders*, 526 F.3d at 154 (describing a punitive damages award within the single-digit ratio as "normal").[9]

---

[9] The plaintiffs argue that the applicable ratio is 1.31-to-1, rather than 7-to-1, because (1) under Georgia law, the plaintiffs can only keep 25% of the punitive damages award, and (2) the plaintiffs' litigation costs and taxable costs should be included in the compensatory damages amount. (Resp. to Mot. to Remit [Docket 460], at 12–13). Thus, the comparable numbers are $437,500 in punitive damages and $320,445 in compensatory damages. (*Id.* at 13). Because I find the 7-to-1 ratio as constitutional in this case, I need not consider the merits of a smaller ratio.

Nevertheless, Bard argues that because the award of compensatory damages was "substantial," due process only permits a one-to-one ratio. (Mem. in Supp. of Remit [Docket 453], at 6 (citing to *Campbell*, 538 U.S. at 428 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."))). The plaintiffs, of course, respond that $250,000 "is not 'substantial' under the facts of this case." (Resp. to Mot. to Remit [Docket 460], at 13). I find it difficult, if not impossible, to put a label on this award as "substantial" or "not substantial" when the plaintiffs' injuries were purely physical with no economic or quantifiable components. In *Campbell*, for instance, the plaintiffs' harm "arose from a transaction in the economic realm, not from some physical assault or trauma," and the Court could easily define the compensatory damages as substantial. 538 U.S. at 426. In contrast, this case concerns pain and physical suffering alone. There is no marketplace where we sell pain and suffering, and as such, measuring the compensatory damages award in this case is akin to placing a value on an arbitrary enterprise. I therefore refuse to quantify the compensatory damages in this case as substantial or not substantial and instead defer to and trust in the jury's valuation of the plaintiffs' injuries and perception of Bard's reprehensibility.

Because the disparity between the punitive damages and compensatory damages does not exceed the acceptable single-digit ratio and reflects the jury's assessment of Bard's reprehensible conduct, I find that the second guidepost weighs in favor of upholding the punitive damages award.[10]

---

[10] I also point out that many courts have accepted a higher ratio in cases such as this, where the monetary value of the physical harm could not be readily determined. *See Campbell*, 538 U.S. at 425 (recognizing that a "higher ratio might be necessary where the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine") (internal quotations omitted); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 494 (2008) ("Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing the chances of getting away with it) . . . ."); *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262 (10th Cir. 2000) ("[A]s in cases such as Ms. Deters', where the injury is primarily personal, a greater

### 3. Comparable Penalties

The third guidepost arises from the premise that a punitive damages award "cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal." *Gore*, 517 U.S. at 584. The court must determine whether the punitive damages award "is excessive in light of comparable civil penalties." *Clark*, 436 F.3d at 607. Unable to identify a comparable civil penalty under Georgia law for the reprehensible conduct at issue, Bard calls upon the federal Safe Medical Devices Act of 1990, which imposes fines against device manufacturers for various violations of federal requirements related to medical devices. *See generally* 21 U.S.C. § 333(f) (2012). Pursuant to this Act, a device manufacturer is subject to a maximum $1,000,000 civil penalty for failing to comply with certain federal requirements concerning risk evaluation and mitigation, safety labeling, and clinical trials. *Id.* Bard argues that the punitive damage award "is significantly larger than the maximum civil penalty Congress deemed appropriate for the alleged conduct at issue in this case," and therefore, remittitur is required. (Mem. in Supp. of Remit [Docket 453], at 8).

Bard's reliance on § 333(f) is misplaced. While § 333(f) reprimands manufacturers for violations of the Federal Food, Drug and Cosmetic Act ("FDCA"), such as misbranding, the statute does not provide sanctions for conduct that is not regulated by the FDCA, such as a manufacturer's failure to warn physicians about known risks. Furthermore, the statute does not appear to take into account the *consequences* of any one violation of the FDCA. And in this case, the jury found that the consequences experienced by Ms. Cisson were severe and permanent. In short, the civil penalty provided under the Safe Medical Devices Act only sanctions one element of tortious conduct—breach—and does not on its face address duty, causation, or injury. I do not

ratio may be appropriate.").

18

regard § 333(f) as a "comparable civil penalty" for purposes of applying the third guidepost, and as a result, the last guidepost does not provide much assistance one way or the other in this matter. *See, e.g.*, *Fox v. Encounters Int'l*, No. 05-1139, 2006 WL 952317, at *9 (4th Cir. Apr. 13, 2006) (passing over the third guidepost because the civil penalty offered "does not take into consideration the willful and wantonness of Defendants' conduct" and was therefore not comparable to the punitive damages award).

The first and second guideposts, however, demonstrate that there is no basis upon which to order a remittitur. The seven-to-one ratio is both reasonable and proportionate to the amount of harm inflicted upon the plaintiffs, and in light of what the jury found to be reprehensible conduct, the award furthers the dual purposes of punishment and deterrence without entering the "zone of arbitrariness" that would render it unconstitutional. *Gore*, 517 U.S. at 568.

I do not find Bard's other arguments advanced in support of remittitur persuasive. First, Bard contends that the punitive damages award "is duplicative and without purpose." (Mem. in Supp. of Remit [Docket 453], at 8). The jury instructions confirm, however, that the compensatory damages award did not "contain [a] punitive element," *Campbell*, 538 U.S. at 426, that could have produced duplicative awards. (*Compare* Final Jury Instructions [Docket 339], at 21–22 (instructing that compensatory damages "are given as pay or compensation for injury done" and that the jury could consider pain and suffering; anxiety, shock, and worry; and loss of capacity to work or labor), *with* Trial Tr. Aug. 15, 2013 [Docket 408], at 59:3–7 (instructing the jury to consider Bard's misconduct in awarding punitive damages, including "[t]he nature and egregiousness or reprehensibility of Bard's conduct; the extent and duration of Bard's wrongdoing and the likelihood of its recurrence; [and] the intent of Bard in committing the wrong"), *and id.* at 59:18–20 (instructing the jury to take into account the purpose of punitive

damages)). Bifurcating the liability issue from the punitive damages issue also served to avoid duplicative awards. (*See* Mem. Op. & Order re: Mots. for Summ. J. [Docket 273], at 19–20 (granting Bard's motion to bifurcate the trial)). Second, Bard maintains that the punitive damages award was improperly based on injuries to nonparties. Aside from recanting the argument that the punitive damages award should only be based on the MSDS—an argument I have already rejected, *see supra* n.8—Bard offers no support from the transcript or the exhibit record indicating that the jury was privy to the injuries of nonparties in its deliberation.

In conclusion, the *Gore* guideposts weigh in favor of upholding the jury's punitive damages award, and I therefore **DENY** Bard's Motion to Remit [Docket 452].

**IV. Conclusion**

For all the foregoing reasons, I **FIND** (1) Georgia's punitive damages statute § 51-12-5.1(e)(2) is constitutional under both the Equal Protection Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment (as applied to the states through the Fourteenth Amendment); and (2) the award of punitive damages in the amount of $1,750,000 does not violate the Due Process Clause of the Fourteenth Amendment. Therefore, I **DENY** the plaintiffs' Ancillary Motion [Docket 454], and I **DENY** Bard's Motion to Remit [Docket 452].

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: January 20, 2015

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE